IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ELSA HERNANDEZ, as personal
representative of the wrongful death estate of
Irisema Hernandez, deceased,

      Plaintiff,

v.                                                                            No. 2:17-cv-01218-KRS-GJF

MALIN PARKER, in his official
and individual capacities; ROOSEVELT
COUNTY BOARD OF COMMISSIONERS;
and ROOSEVELT COUNTY SHERIFF'S
DEPARTMENT,

      Defendants.

## ORDER GRANTING IN PART DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT

On August 31, 2016, Irisema Hernandez died when the white Lincoln Town Car Eduardo Lopez was driving and in which she was a passenger in crashed into a tree. Lopez was being pursued in a high-speed chase throughout areas in and around Portales, New Mexico by Defendant Malin Parker, the Sheriff of Roosevelt County, in an unmarked truck. In the final moments of the chase—at least as Lopez describes it—Sheriff Parker attempted a PIT maneuver, bumping the back of the Lincoln with his truck and causing Lopez to lose control of and crash the sedan. Hernandez's Estate subsequently commenced this action seeking compensation from Parker, *inter alia*, under 42 U.S.C. § 1983 for alleged deprivations of Hernandez's rights under the Fourth and Fourteen Amendments as well as various state law theories. Defendants now move for summary judgment on all claims. (Doc. 34). As is relevant here, Sheriff Parker asserts entitlement to qualified immunity on the Estate's federal claims. The Estate disagrees and

argues a genuine dispute of material fact exists as to reasonableness of the pursuit, its termination, and whether the chase was so egregious as to shock the conscience. With the consent of the parties to conduct dispositive proceedings, *see* 28 U.S.C. § 636(c), the Court has considered the parties' submissions and the record on summary judgment. Having done so, the Court determines that Sheriff Parker is entitled to qualified immunity on the Estate's federal law claims and declines to exercise supplemental jurisdiction over the remaining state-law causes.

## FACTS[1]

On August 31, 2016, Sheriff Parker and Lieutenant Javier Sanchez of the Roosevelt County Sheriff's Department were on patrol in and around Portales, New Mexico. (Doc. 40-6, at 5). They were in Sheriff Parker's patrol vehicle, an unmarked, white Chevy extended-cab pickup truck equipped with internal lights and sirens. (Doc. 40-6, at 4; 40-7, at 12-13). That day, Sheriff Parker wore a black hoodie. (Doc. 40-5, at 3). Lieutenant Sanchez was clad in full Sheriff's Department uniform. (*Id.*).

At 11:55 a.m., Sheriff Parker observed a white Lincoln town car he recognized as belonging to Hernandez, whom Sheriff Parker knew, at the Classic American Economy Inn. (Doc. 40-6). Sheriff Parker believed that Hernandez was on house-arrest at the time because the Sheriff was in court at the time the conditions of release were imposed restricting Hernandez's movements. (Doc. 45-6, at 5). Sheriff Parker also saw Lopez, whom Sheriff Parker did not know, and Hernandez approaching the sedan. (Doc. 40-6, at 5). After passing the motel, Sheriff Parker turned the truck around to contact Hernandez. (Doc. 40-6, at 5). When Sheriff Parker

---

[1] The Court recounts the facts in the light most favorable to the Estate as it must at this stage in the litigation. In their respective briefing, the parties submit numerous other facts they claim are material. The facts set forth here are those critical to the qualified immunity analysis and the background of the case, not to the state law claims that may well permit the parties to consider Lopez's state of mind as well as Sheriff Parker's. The use-of-force inquiry, as explained below, is entirely objective, and turns on reasonableness.

reached the motel, he parked his truck in front of Hernandez's Lincoln, boxing it in. (Doc. 40-6, at 5).

By the time Sheriff Parker and Lieutenant Sanchez got out of the vehicle, Hernandez was in the passenger side of the Lincoln; Lopez sat in the driver's seat. (Doc. 34-5; Doc. 40-6, at 5). Lopez was frantically trying to and did start the sedan. (Doc. 40-6, at 5). Hernandez appeared to be reaching for the floor board (Doc. 40-6, at 5). Both Sheriff Parker and Lieutenant Sanchez had their guns drawn. (Doc. 34-1, at 4). Sheriff Parker was at the driver side of the Hernandez's vehicle, and Lieutenant Sanchez was near the passenger side. (Doc. 40-6, at 5-6). Neither Sheriff Parker nor Lieutenant Sanchez identified himself as a law enforcement officer nor gave commands, and Sheriff Parker stood directly in front of the Lincoln and pointed his gun at Lopez. (Doc. 40-6, at 6; 40-8, at 2)

The Lincoln backed up to maneuver around the Sheriff Parker's truck, nearly hitting the exterior of the motel. (Doc. 34-5, at 2; Doc. 40-6, at 6). Lopez then drove forward, struck Sheriff Parker, left the motel, headed East on U.S. 70. (Doc. 40-6, 6-7; 40-7, at 11). After Sheriff Parker composed himself, he and Lieutenant Sanchez gave chase in the pickup. (Doc. 40-6, 5-10; 40-7, at 11-12). They engaged the emergency equipment, although the light bar was not visible from the side. (Doc. 34-1, at 7, 34-5, at 2). Lopez, however, heard only the siren. (Doc. 40-8, at 2).

From Highway 70, Lopez made a left on University Avenue and from University, a right turn onto North Avenue O. (Doc. 34-1, at 6-7; Doc. 40-6, 5-10). Lopez ran a stop sign at the intersection of North O and West Lime and another stop sign at North O and New Mexico Highway 236, where Lopez almost collided with another vehicle. (Doc. 34-1, at 6-7, 11; Doc. 40-6, 5-10). Lopez turned left on New Mexico Highway 236 and turned south on Roosevelt

Road T. (Doc. 34-1, at 6-7, 11). At the intersection of Road T and New Mexico Highway 267, Lopez ran another stop sign as he turned right onto Highway 267. (Doc. 34-1, at 6-7, 11; Doc. 40-6, 5-10).

Between the intersections of Roads T and U on Highway 267, Sheriff Parker hit the Lincoln with his truck at a high rate of speed. (Doc. 34-8, at 2-3; Doc. 40-2, at 2-4; 40-4, at 2-4, 7-8). Lopez, who later described the impact as a "PIT maneuver," lost control of the vehicle, slid into an adjacent bar ditch, and hit a tree. (Doc. 34-8, at 2-3; Doc. 40-2, at 2-4; 40-4, at 2-4, 7-8; 40-8, at 2-3). Hernandez died as a result of injuries sustained during the automobile crash. (Doc. 34-8, at 2-3). During the chase, speeds exceeded 100 miles per hour. (Doc. 40-4, at 2). The pursuit took place in residential areas and near a university and schools while school was in session. (Doc. 40-6, at 15). At the time of the collision, there were no other vehicles in front of the town car. (40-8, at 2-3).

On December 12, 2017, Hernandez's Estate commenced this action. (Doc. 1). In its six-count complaint, the Estate alleges: (1) Sheriff Parker was negligent under New Mexico law in operating his unmarked patrol vehicle; (2) Sheriff Parker committed aggravated assault and battery under New Mexico law by engaging in the high-speed chase resulting in Hernandez's death; (3) the County is vicariously liable for Sheriff Parker's wrongful actions; (4) Hernandez's death deprived of her children of consortium; (5) Sheriff Parker unlawfully seized Hernandez contrary to the Fourteenth Amendment; and (6) Sheriff Parker engaged in excessive force in violation of the Fourth and Fourteenth Amendments. (Doc. 1). Defendants now move for summary judgment on the state-law claims and Sheriff Parker for qualified immunity on Counts V an VI. (Doc. 34).

## STANDARD OF REVIEW

Qualified immunity entitles a law enforcement officer to avoid trial and the other burdens of litigation arising from the performance of his or her discretionary functions. *See Quinn v. Young*, 780 F.3d 998 (10th Cir. 2015). To give effect to the doctrine, the Court views the parties' respective burdens on summary judgment differently. *See Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008); *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1108 (10th Cir. 2008). To defeat qualified immunity on summary judgment, the plaintiff must satisfy "a strict two-part test" by establishing with record evidence (1) "the defendant's actions violated a constitutional . . . right" and (2) that right was "clearly established at the time of the conduct at issue." *Clark*, 513 F.3d at 1222 (internal quotation marks and citation omitted). The Court may address the two prongs in whatever order it chooses "in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If a plaintiff satisfies the two-part test, then—and only then—does the law enforcement officer bear his or her traditional burden to show the absence of a triable issue of fact. *See Clark*, 513 F.3d at 1222.

## ANALYSIS

In a Section 1983 case, the Court's first task is to "identify[] the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). "Where . . . the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment . . . against unreasonable . . . seizures[.]" *Id.* (citation omitted). In *Graham*, the Supreme Court held that all excessive-force claims stemming from "an arrest, investigatory stop, or other 'seizure' . . . [must] be analyzed under the Fourth Amendment

and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Id*. at 395. The reason, the Supreme Court said, is the Fourth Amendment "provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct," while the Fourteenth Amendment more generally prohibits arbitrary and abusive government conduct. *Id.*

In this case, the Estate's complaint alleges both, mutually exclusive theories of recovery. Count V seeks recovery for Hernandez's death resulting from Sheriff Parker's conscience-shocking high-speed pursuit while Count VI alleges that Sheriff Parker was objectively unreasonable in engaging in a dangerous high-speed police pursuit. As explained above, however, the former, substantive due process theory is only viable under Section 1983 *if* no seizure occurred. The parties, however, do not concretely address this threshold issue in any meaningful way.

### **The Applicability of the Fourth and Fourteenth Amendments**

In *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998), the Supreme Court examined whether a high-speed police pursuit resulting in death should be analyzed under the Fourth Amendment or the substantive due process component of the Fourteenth Amendment. In that case, police responded to a fight. Unrelated to the disturbance, one of the officers saw a motorcycle quickly approaching the scene with a driver and passenger. The officer told the individuals to stop and engaged his emergency lights of his patrol car, which was adjacent to a fellow officer's cruiser. The motorcycle did not stop; instead the driver slowed down and maneuvered between the two police cars. The officer gave chase and for the next seventy-five seconds pursed the motorcycle through a residential neighborhood at speed reaching 100 miles per hour. The pursuit ended when the motorcycle tipped over while making a sharp left turn.

The driver fell off the bike, but the police car stuck the bike, propelling the passenger seventy feet to his death.

The Supreme Court held that under the circumstances, no seizure occurred, and substantive due process therefore governed the analysis. *Id.* at 844. The Court explained that "a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement through means intentionally applied." *Id.* at 844 (citation omitted). Accidentally crashing into someone that results in death does not meet this definition, and the more general provision of the Fourteenth Amendment forbidding arbitrary action by the government that "shocks the conscience" controlled the analysis. *Id.*

Under *Lewis*, the question is whether Sheriff Parker terminated Hernandez's "freedom of movement through means intentionally applied." In *Scott v. Harris*, the Supreme Court explained a botched PIT maneuver satisfied this standard. 550 U.S. 372, 381 (2007) (citing *Brower v. County of Inyo*, 489 U.S. 593, 596-597 (1989) ("If . . . the police cruiser had pulled alongside the fleeing car and sideswiped it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure.")). Drawing all reasonable inferences in the Estate's favor, Sheriff Parker attempted a PIT maneuver whereby his truck bumped the Lincoln to end the pursuit. Lopez described the end of the pursuit in that manner, and two witnesses testified that that Sheriff Parker bumped or pushed Hernandez's car with his patrol vehicle. Taking the Estate's contention that the bumping was intentional and designed to

end the chase, that bumping action by Sheriff Parker amounts to a seizure of Hernandez under the Fourth Amendment.

Hernandez's status a passenger, and arguably not the object of Sheriff Parker's use of force, does not change the analysis. While the Tenth Circuit has not spoken directly to this issue, *see Carabajal v. City of Cheyenne,* 847 F.3d 1203, 1212 (10th Cir. 2017), the Supreme Court held in *Brendlin v. California*, that a traffic stop seizes both the driver and any passenger. 551 U.S. 249, 257-58 (2007). The Third Circuit has extended *Brendlin*'s logic to a passenger in a police-pursuit scenario that ended when a police officer fired into the fleeing car. *Davenport v. Borough of Homestead*, 870 F.3d 273, 279 (3d Cir. 2017). Although the court identified a circuit split as to whether a passenger is seized along with a driver, the court observed that "those circuits that have suggested otherwise reached their decisions on this issue before the Supreme Court decided *Brendlin*[.]" *Id.*

The Third Circuit reasoned that "[e]ven if the officers' intended application of force would have only incidentally seized [the passenger], because her freedom of movement was terminated by the very instrumentality set in motion or put in place in order to achieve [the driver] and her detention, there is no set of facts that precludes a finding of a Fourth Amendment seizure." *Id.* (internal citations and quotation marks omitted). As a result, "a passenger shot by an officer during the course of a vehicular pursuit may seek relief under the Fourth Amendment"; the Fourth Amendment and "not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Id.* (citation omitted). In fact, "the District Court erred in independently analyzing [the plaintiff's] Fourth and Fourteenth Amendment claims." In line with *Brendlin* and *Davenport*, the Court concludes that the Fourth Amendment applies to the Estate's federal claims.

## **Excessive Force Under the Fourth Amendment – the Constitutional-Violation Prong of the Qualified Immunity Analysis**

Under the Fourth Amendment, "all that matters is whether [Sheriff Parker's] actions were [objectively] reasonable." *Scott*, 550 U.S. at 383. To determine reasonableness, the Court is charged with "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* (citation omitted). Although the Court must view the facts in the light most favorable to the plaintiff on summary judgment, "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" *Graham*, 490 U.S. at 396-97. The Court must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97 (internal quotation marks and citations omitted)

In *Scott*, the Supreme Court undertook the reasonableness inquiry in the context of a police pursuit. 550 U.S. at 376. There, a police officer activated his emergency lights after clocking the plaintiff driving seventy-three miles per hour in a fifty-five zone. The plaintiff did not stop and instead accelerated. A chase ensued at speeds exceeding eighty-five miles per hour. Other officers, including the defendant, joined the pursuit. At one point, the plaintiff pulled into a shopping center, and the officers nearly boxed in the plaintiff. The plaintiff, however, evaded the trap by turning sharply and colliding with the defendant's patrol car. Thereafter, the defendant led the pursuit, and after ten miles of chasing, asked for permission to terminate the pursuit by using a PIT maneuver. After getting the go ahead, the defendant "applied his push bumper to the rear of [the plaintiff's] vehicle" and the plaintiff "lost control of his vehicle, which left the roadway, ran down an embankment, overturned, and crashed." *Id*.

The Court held that the defendant's use of force was reasonable under the circumstances. In reaching that conclusion, the Court considered "the risk of bodily harm that [the defendant's] actions posed to [the plaintiff] in light of the threat to the public that [the defendant] was trying to eliminate." *Id.* at 383. The Court recognized that "there is no obvious way to quantify the risks on either side," but reasoned the summary judgment record made clear that the plaintiff "posed an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase." *Id.* at 383-84. It was "equally clear" to the Supreme Court that the defendant's actions "posed a high likelihood of serious injury or death to the plaintiff," although not as much as shooting at the car. *Id.*

Ultimately, the Court balanced the "perhaps lesser probability of injuring or killing numerous bystanders against the perhaps larger probability of injuring or killing a single person" by taking into account "not only the number of lives at risk, but also their relative culpability." *Id.* at 384. The Court drew heavily on the fact that it was the plaintiff "who intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight." Moreover, the plaintiff did not stop "despite blue lights flashing and sirens blaring" over a ten-mile chase. The Court explained that "those who might have been harmed had [the defendant] not taken the action he did were entirely innocent." *Id.* In view of these facts, the Court had "little difficulty in concluding [the use of force] was reasonable." *Id.*

It is hard to see how *Scott*'s holding does not dictate the outcome in this case. Here, upon arrival at the motel and exiting his truck, Sheriff Parker observed Lopez and Hernandez in Hernandez's vehicle. It appeared that Hernandez was reaching for something while Lopez started the Lincoln. Although Sheriff Parker was dressed in a hoodie, Lieutenant Sanchez was in full uniform as the two stood on either side of the town car. Sheriff Parker and Lieutenant Sanchez

drew their guns, but Lopez backed up and maneuvered around Sheriff Parker's pickup, striking Sheriff Parker in the process, a felony under New Mexico law. *See* N.M. Stat. Ann. § 30-22-24 (defining battery upon a peace officer, a fourth-degree felony, as the "unlawful, intentional touching or application of force to the person of a peace officer while he is in the lawful discharge of his duties, when done in a rude, insolent, or angry manner").

Sheriff Parker, of course, pursued Lopez, at this point a fleeing suspect. It is true Sheriff Parker's duty vehicle was unmarked, but it was equipped with internal lights and sirens, which Sheriff Parker says he engaged. Lopez concedes he heard the siren. Nonetheless, Lopez did not stop, and a chase ensued that reached speeds of over 100 miles per hour. Lopez drove through residential neighborhoods, near schools and a university, and nearly collided with another vehicle, and ran stop signs. The pursuit terminated when Sheriff Parker employed a PIT or similar maneuver. Sheriff Parker's truck struck the Lincoln sending the Lincoln into the ditch and culminating in Hernandez's death. As in *Scott*, Lopez was the catalyst of entire chain of events. Viewed objectively, from Sheriff Parker's perspective, Lopez battered a police officer, intentionally placed himself, Hernandez, and the public in danger by fleeing and not stopping in response to sirens and lights, nearly colliding with a car, and running stop signs. As in *Scott*, it was reasonable to end the pursuit and the danger it posed by bumping the back of the sedan. Although Hernandez died, her rights under the Fourth Amendment were not violated.

The Estate argues that Lopez thought he was being mugged because Sheriff Parker was in a hoodie. What Lopez thought, however is irrelevant to the governing, objective standard of reasonableness. *Graham*, 490 U.S. at 396-97. Even if it was initially unclear to Lopez, Lieutenant Sanchez was in full uniform and Lopez concedes he heard the siren from Sheriff Parker's unmarked police truck. Lopez also made comments subsequent to the incident that he

fled from the motel because he wanted to protect Hernandez from being charged for possession of drugs, which suggests he knew that Sheriff Parker was a law enforcement officer when he fled. (Doc. 34-9, at 1-2). The Estate also suggests Sheriff Parker had a duty to retreat from "harm's way" but instead stood in front of the Lincoln where he could be hit. Putting aside the underlying assumption that Sheriff Parker would have had to know that Lopez would drive into him, Sheriff Parker's position directly in front of the car Lopez was driving is of no constitutional significance. The Estate points to no case law, and the Court could not find any, requiring Sheriff Parker to move out of the way.

The Estate also insists Sheriff Parker did not know that Lopez intended to injure others and "the Sheriff's own investigator [determined] bumping Mr. Lopez off the road was an inappropriate use of deadly force because of the circumstances surrounding the possible charges or crime committed didn't warrant deadly force." (Doc. 40, at 19) (quotation marks omitted). The Fourth Amendment, however, does not require Sheriff Parker to divine Lopez's intentions at all. Instead, Sheriff Parker was required to examine the totality of the circumstances and use force that was objectively reasonable. It is undisputed that Lopez nearly struck another driver during the pursuit, drove at very high rates of speed in residential areas and near schools and a university, and ran stop signs. Protecting the public from further harm featured prominently in the Supreme Court's determination that the officer's PIT-like maneuver in *Scott* was reasonable under the Fourth Amendment. Moreover, an opinion as to reasonableness from an investigator is not law or fact this Court may consider on summary judgment and does not change the analysis.

The Estate's underlying assumption that Sheriff Parker should have simply stopped chasing Lopez and thereby ended the threat to Lopez, Hernandez, and the public does not withstand scrutiny. As the Supreme Court explained in *Scott*, "there would have been no way to

fled from the motel because he wanted to protect Hernandez from being charged for possession of drugs, which suggests he knew that Sheriff Parker was a law enforcement officer when he fled. (Doc. 34-9, at 1-2). The Estate also suggests Sheriff Parker had a duty to retreat from "harm's way" but instead stood in front of the Lincoln where he could be hit. Putting aside the underlying assumption that Sheriff Parker would have had to know that Lopez would drive into him, Sheriff Parker's position directly in front of the car Lopez was driving is of no constitutional significance. The Estate points to no case law, and the Court could not find any, requiring Sheriff Parker to move out of the way.

The Estate also insists Sheriff Parker did not know that Lopez intended to injure others and "the Sheriff's own investigator [determined] bumping Mr. Lopez off the road was an inappropriate use of deadly force because of the circumstances surrounding the possible charges or crime committed didn't warrant deadly force." (Doc. 40, at 19) (quotation marks omitted). The Fourth Amendment, however, does not require Sheriff Parker to divine Lopez's intentions at all. Instead, Sheriff Parker was required to examine the totality of the circumstances and use force that was objectively reasonable. It is undisputed that Lopez nearly struck another driver during the pursuit, drove at very high rates of speed in residential areas and near schools and a university, and ran stop signs. Protecting the public from further harm featured prominently in the Supreme Court's determination that the officer's PIT-like maneuver in *Scott* was reasonable under the Fourth Amendment. Moreover, an opinion as to reasonableness from an investigator is not law or fact this Court may consider on summary judgment and does not change the analysis.

The Estate's underlying assumption that Sheriff Parker should have simply stopped chasing Lopez and thereby ended the threat to Lopez, Hernandez, and the public does not withstand scrutiny. As the Supreme Court explained in *Scott*, "there would have been no way to

convey convincingly to [Lopez] that the chase was off, and that he was free to go." *Scott*, 550 U.S. at 385. In fact, Lopez "would have had no idea whether [police] were truly letting him get away, or simply devising a new strategy for capture." *Id.* As a result, Lopez "might have been just as likely to respond by continuing to drive recklessly as by slowing down and wiping his brow." *Id.* Additionally, requiring Sheriff Parker to capitulate would create obvious, "perverse incentives" that a "fleeing motorist would know that escape is within his grasp, if only he accelerates to 90 miles per hour, crosses the double-yellow line a few times, and runs a few red lights." *Id.* As did the Supreme Court in *Scott*, the Court here rejects the Estate's implication that Sheriff Parker was required to stop the chase and give up.

### **Excessive Force Under the Fourth Amendment – the Clearly Established Prong of the Qualified Immunity Analysis**

To survive summary judgment, the Estate must establish that Hernandez's rights under the Fourth Amendment were so clear as of August 31, 2016 "that ***every*** reasonable official would have understood that what he is doing violates that right." *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018) (internal quotation marks omitted) (emphasis added)). It is incumbent upon the plaintiff to identify "a Supreme Court or Tenth Circuit case that is sufficiently on point," or cite a "weight of authority from other courts," *id.*, in which the officer "was held to have violated the Fourth Amendment." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). A plaintiff may not rely on cases that frame Fourth Amendment prohibitions in the abstract such as the right to be free from excessive force; the Supreme Court requires a judicial decision "particularized to the facts of the case" and capable of giving an officer "fair and clear warning" that his conduct is unconstitutional in the context he faces. *Id.* This standard ensures that officers do not hesitate, risking their lives or others' for fear of civil liability arising from reasonable mistakes in view of "the sometimes hazy border between excessive and acceptable force." *City & Cnty. Of San*

*Francisco v. Sheehan*, ___ U.S. ___, 135 S. Ct. 1765, 1777 (2015); *Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("[Q]ualified immunity provides ample protection to all but the plainly incompetent or those who knowingly violate the law.").

The Estate has not carried its burden. *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007), to which the Estate points, involved the tasering of man whose crime was to carry a file from a courthouse. At most, *Casey* can be used here for the *general* proposition that the use of force must be reasonable in effecting an arrest. *Cf. Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) ("We have repeatedly told courts not to define clearly established law at a high level of generality"). Contrary to the Estate's argument, the Tenth Circuit's decision in *Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150 (2010), would not have placed Sheriff Parker on notice that his bumping of the Lincoln violated Hernandez's Fourth Amendment rights. *Montoya* was not a pursuit case; a police officer shot into a van when the vehicle, stuck on a pile of rocks at the time, lurched forward. As with *Casey*, the utility of *Montoya* is limited to a more general Fourth Amendment edict: any use of force must be reasonable, which is insufficient to satisfy the clearly-established prong.

Although *Cordova v. Aragon*, 569 F.3d 1183, 1189 (10th Cir. 2009), the Estate's next citation, did involve a car pursuit, the distinguishing feature of that case from this one is plain: "This is not a case of ramming. Officer Aragon shot Mr. Cordova in the back of the head while he was driving[.]" *Id.* Thus, *Cordova* is of limited value in this context, especially where extant Supreme Court authority more squarely applies and concludes *no* constitutional violation occurred. Finally, the Estate's reliance on a subsequently reversed, out-of-circuit decision, *Terrell v. Larson*, 371 F.3d 418 (8th Cir. 2004), *rev'd* 396 F.3d 975, 977 (8th Cir. 2005) (*en banc*) is misplaced. Not only was *Terrell* reversed for denying qualified immunity, the case arose under

the Fourteenth Amendment. In sum, even if the Estate had shown a technical violation of the Constitution, Sheriff Parker would be entitled to quailed immunity on the clearly established prong of the analysis.

## Municipal Liability

Although the Court could find no mention of municipal liability as a cause of action in the complaint, the Estate references the concept in its response brief. The Court declines to construe the Complaint as asserting such a claim. Nonetheless, to the extent the Estate intended to reach Roosevelt County on a theory of municipal liability by naming Sheriff Parker in his official capacity, *see Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1316 n.2 (10th Cir. 1998) ("§ 1983 suit against a municipality and a suit against a municipal official acting in his or her official capacity are the same") (citation omitted), the Court's determination that Sheriff Parker did not violate the Constitution is dispositive of the matter. *Id.* at 1316 (an essential element of a municipal liability/official capacity claim is that "the municipal employee committed a constitutional violation"). Summary judgment, therefore, is appropriate on any official-capacity claim.

## State-Law Claims

The Court declines to exercise supplemental jurisdiction over Counts I – IV of the Estate's complaint. These claims arise under New Mexico law. *See* 28 U.S.C. § 1367(c)(3); *Carlsbad Technology, Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."). Although the decision is discretionary, it is favored practice to "dismiss supplemental state law claims after all of the federal claims have been dismissed." *United States v. Botefuhr*, 309 F.3d 1263, 1273 (10th Cir. 2002). The Court

does not discern any reason to depart from this general rule in this case and dismisses Counts I – IV without prejudice to the Estate filing these causes of action in the New Mexico courts.

## Motion to Strike

The Estate separately asks the Court to strike the affidavit of Sheriff Parker attached to his moving papers. (Doc. 42). The Estate contends that Sheriff Parker's affidavit is not based on personal knowledge because he does not affirmatively make that averment and states, without foundation, that another vehicle appeared to have "slammed on its breaks"; "the driver of the Lincoln presented a danger of death or injury to himself, to his passenger, and to other motorists, including my deputies"; and Sheriff Parker's "intention throughout the entire pursuit was not to cause anyone any harm, but to safely end the pursuit and eliminate the danger and to apprehend the driver of the Lincoln." (Doc. 42, p. 2). The Court did not consider any of these averments in reaching the conclusion that Sheriff Parker is entitled to qualified immunity. The motion is therefore moot.

## CONCLUSION

For the reasons stated above, Sheriff Parker is entitled to qualified immunity on the Estate's claim under the Fourth Amendment. The Estate's substantive due process claim fails as a matter of law because the challenged actions resulted in a seizure and, for that reason, the Court may not analyze the pursuit under the Fourteenth Amendment. To the extent the Estate intends its official capacity designation in the caption of the complaint to reach Roosevelt County and its subdivisions under a municipal-liability theory, the determination that Sheriff Parker did not violate Hernandez's constitutional rights precludes liability. As to the remainder of the claims, the Court declines to exercise supplemental jurisdiction.

**IT IS, THEREFORE, ORDERED** that Defendants' motion for summary judgment (Doc. 34) is **GRANTED** in part based on Parker's qualified immunity, and Counts V and VI are **DISMISSED with prejudice**.

**IT IS FURTHER ORDERED** that Counts I-IV are **DISMISSED without prejudice**.

**IT IS FURTHER ORDERED** that Plaintiff's motion in limine (Doc. 33) and motion to strike (Doc. 42) are **DENIED as moot**.

**IT IS FURTHER ORDERED** that Defendants' motions in limine (Docs. 38 & 55) are **DENIED as moot**.

_____
KEVIN R. SWEAZEA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent